# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ROGER HERBERT,** )<br> **Petitioner,** )<br> )<br> **v.** )<br> )<br> **THOMAS DICKHAUT, Superintendent,** )<br> **Respondent.** ) | **Civil Action No. 06-10036-NG** |

GERTNER, D.J.

## MEMORANDUM AND ORDER
July 21 2011

Petitioner Roger Herbert ("Herbert") filed a petition for habeas corpus pursuant to 28 U.S.C. § 2254. Herbert was convicted of armed robbery and felony murder for his involvement in a highly publicized January 1990 crime, the murder of a Northeastern University student, Mark Belmore ("Belmore"). Both Belmore and Herbert were 19 years old.

It was a troubling, troubling crime on many levels. The incident had, as the trial judge noted, "a certain element of racism." Trial Tr. vol. 8, 7:20-23, Mar. 8, 1991. Herbert and the group of people he was with were black. Belmore was white. The prosecutor contended that racial animus was the motive for the crime. One of the people with Herbert was quoted as saying, "Let's get the first white person we see." Trial Tr. vol. 2, 53:17-18, Mar. 1, 1991. The defense tried to argue that the crime was an "outgrowth" of "their racial animosity that is so prevalent in this society." Trial Tr. vol. 6, 50:22-23, Mar. 6, 1991. (The judge sustained the prosecutor's objection to the comment.) The stabbing of the victim, he argued, was an impulsive act motivated after Belmore grabbed Herbert's jacket.

While the petitioner raises a number of issues, only two have been preserved. Herbert argues that the jury selection process was racially biased. Eight black people were in the jury pool. Two were excused for cause, leaving six. After two of the six had been challenged by the

Commonwealth, Herbert's counsel approached the judge inquiring if the government planned to challenge the third, and if the prosecutor so did, counsel argued that the challenge violated Batson v. Kentucky, 476 U.S. 79 (1986).

The government indicated that he would challenge the juror. The court asked for an explanation. The Commonwealth pointed to two things: the juror's hesitancy in answering the questions and the fact that the juror lived near the scene of the offense. The defense demonstrated that white jurors who were not challenged were also hesitant in their answers, and/or pointed generally to white jurors who worked or attended school near the crime scene. Nevertheless, the trial judge allowed the government's challenge. Three black jurors remained.

The trial judge then directed the black juror who was sitting in the foreperson's seat, to exchange seats with a white juror whom he selected as the foreperson. The selection of the white juror in that seat arguably protected her from becoming an alternate. (Alternates were chosen by lot from the panel excluding the foreperson.) The remaining black jurors on the panel were not so protected. The result was troubling -- only one black juror in the deliberating jury and two black alternates.

Herbert also challenges the admissibility of his confession. He claims that the statement was taken after he invoked his right to counsel, not just once, but twice. The Commonwealth contests Herbert's account of invoking his Miranda rights. What is clear is that following 2.5 hours of questioning, and an unrecorded statement, Herbert made a tape-recorded confession in the presence of two detectives. The tape-recording, moreover, reflected Miranda warnings. The only other documentation that might have reflected such warnings -- the booking slip from his earlier arrest -- did not.

The trial court denied Herbert's motion to suppress this confession. On March 8, 1991, the jury convicted Herbert of armed robbery and of first-degree murder under two independent theories: felony murder and extreme atrocity or cruelty. Trial Tr. vol. 8, 4:4-6:16, Mar. 8, 1991. He was sentenced to life imprisonment without parole on the first-degree murder conviction[1] and thirty-five to forty-five years on the armed robbery conviction to be served concurrently with the life sentence. Id. at 21:23-22:16.

Herbert appealed; the Supreme Judicial Court ("SJC") of Massachusetts affirmed his conviction. See Commonwealth v. Herbert, 421 Mass. 307 (1995). Proceeding pro se, Herbert filed a motion for a new trial that raised six new claims, all of which were denied by the trial court. Herbert then filed an application to a single "gatekeeper" justice of the SJC, as required by the review process set forth in Mass. Gen. Laws ch. 278, § 33E, requesting review by the full SJC of the trial court's denial of his motion for a new trial. That application was also denied.[2]

---

[1] It is unclear from the record whether the judge imposed the life sentence pursuant to the felony murder theory of first-degree murder or the extreme atrocity or cruelty theory. See Trial Tr. vol. 8, 21:23-22:16.

[2] Herbert raised nine claims in his petition for habeas corpus, all of which were brought before the Massachusetts state court either in his direct appeal or his motion for a new trial (claims brought in a federal habeas petition may be exhausted by presenting them to the state court in a motion for a new trial). See Morgan v. Dickhaut, 677 F. Supp. 2d 424, 443 (D. Mass. 2010) (finding that a habeas petitioner exhausted a Sixth Amendment claim where he presented it in his motion for a new trial).): 1) his tape-recorded confession given to detectives after his arrest should have been suppressed by the trial court because he had invoked his right to counsel (raised on direct appeal); 2) black jurors were unconstitutionally excluded from the jury (raised on direct appeal); 3) an instruction should have been given on the impact of intoxication on the requirement of specific intent (raised on direct appeal); 4) the trial judge erred when he denied counsel's request to instruct the jury on manslaughter (raised in motion for a new trial); 5) the trial judge's instruction to the jury regarding malice was erroneous in that he misstated the requirements under the third theory under which the jury could find malice (raised in motion for a new trial); 6) there was insufficient evidence to convict him (raised in motion for a new trial); 7) his sentence, which included both a felony murder sentence and a concurrent armed robbery sentence, violated double jeopardy principles (raised in motion for a new trial);8) he received ineffective assistance of trial counsel because trial counsel failed to object to the trial court's malice instruction and allowed him to be sentenced in violation of double jeopardy principles (raised in motion for a new trial); and, 9) he received ineffective assistance of appellate counsel because appellate counsel failed to argue on direct appeal that the court erred when it refused to instruct the jury on manslaughter, gave an incorrect malice instruction, and sentenced him in violation of double jeopardy standards (raised in motion for a new trial). See Compl. ¶¶ 17-24 (document #2).

In his Memorandum, Herbert argued two claims: the suppression claim and the juror exclusion claim. He also argued that the Antiterrorism and Effective Death Penalty Act ("AEDPA") is unconstitutional and, therefore, his claims should be reviewed under pre-AEDPA standards. A hearing was held on Herbert's petition.

This memorandum addresses the following: 1) whether Herbert's suppression claim has merit; 2) whether Herbert's juror exclusion claim has merit; 3) whether those claims Herbert raised in his petition but did not argue in his memorandum of law are waived; and 4) Herbert's challenge to the federal habeas corpus statute.

To the victim's family, the prospect of rehashing the facts of the crime or worse, witnessing the release of the defendant should this petition be granted, is surely excruciating. To the defendant, the possibility that he has been imprisoned for over ten years without having had a trial that meets constitutional standards, is horrifying. But while I have very serious, serious, concerns about the fairness of the jury selection, I am obliged to deny the claim. I sit in this case not as a trial judge in the first instance. I sit as a federal judge reviewing a state court conviction, sadly many, many years after the trial, and after the law has consistently narrowed the scope of my review.

Three factors determine the outcome of this case. First, I am bound by AEDPA, a statute passed in 1996, which by its terms dramatically cabins my review of state proceedings. This is especially the case after recent Supreme Court decisions.[3] Second, those restrictions apply with special force where I am reviewing state fact-findings, rather than issues of law. Third, First Circuit law concerning Batson could not be less favorable to petitioner's claims. To date, the

---

[3] Cullen v. Pinholster, 131 S. Ct. 1388 (2011); Harrington v. Richter, 131 S. Ct. 770 (2011).

First Circuit has never affirmed a district court decision granting a writ of habeas corpus with a Batson claim.

Thus, what *I* may have done were I in the shoes of the state judge, especially with respect to the Batson claim, is irrelevant to these proceedings.

I.    **FACTS**

The following statement of facts summarizes the facts found by the SJC.

A.    **The Offense:**

On January 14, 1990, Herbert, who was nineteen, was with his brother, Ronald Herbert ("Ronald"), Larry Wayne Robinson ("Robinson"), Larry Villanueva ("Villanueva"), and Harrison Futrell ("Futrell") when Robinson suggested that they "beat someone down." Herbert, 421 Mass. at 308; Trial Tr. vol. 4, 10:18, 85:6-15, 112:4, Mar. 4, 1991. They had come from a 9:50 p.m. movie and were walking down Columbus Avenue near the Ruggles subway stop. Herbert, 421 Mass. at 308. Herbert had a knife, as did "at least two other[s]," Robinson and Villanueva. Id.; Trial Tr. vol. 3, 210:9-212:3, Mar. 2, 1991. Someone saw Mark Belmore, who was also nineteen and a student at Northeastern University. Herbert, 421 Mass. at 308. As the jurors were told, Herbert is a black man and Belmore was a white man. See, e.g., Trial Tr. vol. 1, 26:10-12, Feb. 28, 1991.

Herbert's group chased and started beating Belmore who cried out for help and for someone to call the police. Herbert, 421 Mass. at 308; Trial Tr. vol. 3, 14:19. One witness looked out her apartment window and saw a group of black males punching and kicking a white male. She then saw what she thought was the shimmer of a knife and what could be stabbing motions by two different people who were attacking Belmore. Trial Tr. vol. 3, 26:14-44:13.

Futrell testified that he saw Herbert stab, and Robinson and Villanueva punch and kick, Belmore. Trial Tr. vol. 4, 123:16-128:24, 130:24-131:3. Belmore had five stab wounds as well as injuries consistent with having been punched and cut on the face and body, including defensive wounds on the hands. Trial Tr. vol. 5, 9:20-21:22, Mar. 5, 1991. Belmore's wallet was taken. Herbert, 421 Mass. at 308.

Futrell went to the police on Thursday, January 18, 1990, Trial Tr. vol. 4, 152:19-161:24, and, by the next day, he indicated that he had witnessed, but had not been involved in the attack on Belmore and he incriminated Herbert. Trial Tr. vol. 4, 24:19-137:9, 160:13-161:24. A few days later, the police arrested and interrogated Herbert. Trial Tr. vol. 5, 68:16-73:22, 82:23-105:10. In a confession challenged by the defense, Herbert admitted to participating in the attack and told the police where the knife was located. Herbert, 421 Mass. at 309.

At trial, Herbert's statement to the police was played for the jury. Herbert, 421 Mass. at 309; Trial Tr. vol. 5, 105:15-107:3. In addition, Detective Bruce Holloway testified about Herbert's statement, highlighting his statement, quoting Robinson: "We're going to get the next white person that we see." Trial Tr. vol. 5, 85:5-87:2.

Another trial witness testified that Herbert told him that Belmore had called him (Herbert) a "nigger," and that he had gone crazy and stabbed him. Trial Tr. vol. 3, 230:22-232:4, 265:14-267:1. Later, the witness repeated that Herbert said he went "[c]razy. Snapped." Id. at 266:22. Futrell testified he heard Herbert yell, "get off me. Get off my jacket." Trial Tr. vol. 4, 125:9-10. After which Futrell saw Herbert pull out a knife and stab Belmore. Id. at 126:13-20. Herbert then ran away. Id. at 128:24-130:14. There was no testimony that Herbert took anything from Belmore.

As Futrell and Herbert were running away, Futrell saw that Belmore was standing and moving. Id. at 130:17-23. Villanueva, Robinson, and Ronald continued to attack him. Id. at 131:2-3. Finally, Futrell saw Belmore on the ground, while Villanueva and Robinson stood over him making "stabbing-like motions." Id. at 134:21-135:9.

The theory of defense was "that the stabbing of the victim had been an impulsive act motivated by anger" after Belmore grabbed Herbert's jacket and that Herbert participated in the attack but did not share the intent for the robbery. Herbert, 421 Mass. at 309; Trial Tr. vol. 6, 43:3-19, 48:1-49:6.

### B. Suppression Hearing

The state court held a hearing to determine the voluntariness of Herbert's statement, and particularly, if he had requested counsel before the taped confession. (The motion judge and the trial judge were the same.) See Evidentiary Hr'g Tr. vol. 1, Feb. 11, 1991; Evidentiary Hr'g Tr. vol. 2, February 12, 1991. See also Herbert, 421 Mass. at 309-11.

Herbert testified that "he was held for a time after booking in a room with two uniformed police officers." Herbert, 421 Mass. at 311. One of the uniformed officers told Herbert not to "go down alone." Id. Herbert testified that "he asked one of the uniformed officers if he could see his lawyer and was told that no lawyer was available." Id. Detective Holloway acknowledged that Herbert had been alone with two uniformed officers. Evidentiary Hr'g Tr. vol. 1, 41:10-18. However, those officers did not testify at the hearing, nor did the prosecutor challenge Herbert during cross-examination about what he said happened when Herbert was alone with the uniformed officers.

Herbert also testified that he asked Detective Holloway if he could see a lawyer, a claim Holloway disputed. Id. at 75:5-15, 215:2-6. According to Holloway, Herbert told him his mother felt bad and he (Holloway) responded that she had a right to feel bad. Id. at 47:17-48:11.

Herbert then gave an unrecorded statement, after which he was given his Miranda warnings and asked to repeat his statement on tape. Id. at 181:5-189-10. Holloway testified that he gave Herbert Miranda warnings orally when Holloway entered the room, but gave Herbert the written waiver form just before tape recording of the second statement. Id. at 87:8-15.

Lieutenant Bradley testified that Herbert had been read his rights at Herbert's house, id. at 230:11-18, Holloway claimed that Herbert had been read his rights again at the police station, although it was undisputed that Herbert had not signed the box on the booking sheet so indicating. Id. at 87:8-15, 90:23-91:19.

The trial judge rejected Herbert's version of the facts, in toto, making the following findings of fact, which the SJC upheld:

> 1. At 7:30 a.m. on January 21, 1990, the defendant was informed that he was being arrested for the stabbing murder of [a] Northeastern University student.
>
> 2. Detective Brendan Bradley orally informed Roger Herbert of his Miranda rights in the kitchen of Herbert's house at 62 Hammond Street, Roxbury.
>
> 3. Roger Herbert was transported to the homicide division of the Boston Police Department in South Boston. During his booking by Detective Bruce Holloway, the defendant was advised of his Miranda rights. As he read the defendant each right from his Miranda card, Holloway asked Herbert whether he understood that right. The defendant responded that he did understand as to each right.
>
> 4. The defendant made an oral statement to Detectives Holloway and Washington about his involvement in the killing and robbery of [the victim].

5. Detective Holloway asked the defendant if he were willing to give a tape recorded statement. The defendant said that he would. Detective Holloway presented the defendant with a written <u>Miranda</u> form and told Herbert that it contained his <u>Miranda</u> rights in written form, the same rights that he had been given -- detectives signed as witnesses.

6. The tape recorder was set up and the defendant was advised of his <u>Miranda</u> rights on tape. The defendant stated that he understood his rights. The defendant then gave his tape recorded statement, essentially the same, but somewhat more detailed than his previous unrecorded statement.

7. The defendant was well cognizant of his <u>Miranda</u> rights prior to receiving any warnings on January 21, 1990.

8. No police officer told the defendant that he should tell the truth, and the defendant never requested an attorney, and he was never told that an attorney was not available.

9. The defendant made the statement, voluntarily motivated by his perceived self-interest. He was not under the influence of drugs or alcohol and he was not cajoled, tricked or persuaded to make his statements.

<u>Herbert</u>, 421 Mass. at 309-311. There was no reference to the defendant's age, the fact that he had an IQ of 76, or the fact that the two uniformed officers who could have corroborated or contradicted his testimony about requesting counsel were never called. Nor was there any mention of the length of the interrogation, three hours, or that only a portion of it was taped, while the rest of it was not.

### C. Jury Selection

The defendant requested individual voir dire on the question of bias or prejudice, because he was black and the victim, white, as well as the extraordinary press coverage. <u>See</u> Trial Tr. vol. 1, 3:14-4:21, 18:2-20:18. The trial judge asked each potential juror a series of questions. <u>See</u> <u>id.</u> at 18:2-20:18. First, the judge asked whether a week-long sequestration would present

problems.  See id.  Second, the judge inquired about whether the potential juror had read anything about the case and if so, whether they could still decide the case fairly.  See id.

Finally, the judge asked questions pointed directly at the racial issues:  1) Whether, given that the defendant in the case was a black man and the victim was a white man, the juror had any feelings about [black/white][4] persons that could affect their judgment in deciding the particular case; and 2) whether the juror could decide the case fairly and impartially, unaffected by racial differences between the defendant and the alleged victim.  See id.

The jury was selected after a voir dire of sixty-six potential jurors.  There were eight black people  in the pool.  Herbert, 421 Mass. at 313.  Two were excused for cause by the trial judge.  Id.  The Commonwealth exercised peremptory challenges against three of the remaining six black jurors.  Id.

The defendant objected to the third challenge, to a juror named Linda Bobb.  Trial Tr. vol. 1, 175:18-182:19.  Defendant claimed the Commonwealth was systematically excluding black people from the jury.  See id. at 180:22-181:2.  When the judge asked whether Juror Bobb could be fair and impartial, she said, "Maybe."  Id. at 176:18-177:1.  When he asked if she could decide the case solely on the evidence in court, she responded, "Yeah."  Id. at 177:2-7.  The judge inquired if Juror Bobb was confident about that and she said, "Somewhat – you know, not too sure, but –."  Id. at 177:8-11.  The judge repeated the question, asking Juror Bobb if she could confine her deliberations to the evidence in court to which she answered, "Yes."  Id. at 177:19-178:2.  Asked if she had "any feelings about white people that would affect [her] judgment" in deciding the case, she said, "No."  Id. at 178:5-8.  And when asked again if she

---

[4] It appears from the transcript, that the judge asked people whom he believed to be white whether they had any feelings about black people, and the reverse for jurors that he perceived to be black or non white.

could be fair and impartial, she said, "Yes," and when asked if she was aware of any reason she could not be a fair and impartial juror, she said, "No." Id. at 178:9-18; Herbert, 421 Mass. at 314 n.3.

Counsel asked to see the judge. Trial Tr. vol. 1, 178:20-24. The prosecutor confirmed he planned to challenge Juror Bobb. Id. at 178:1-3. The following exchange took place:

| [Prosecutor]: | The particular reason, though, is she lives near the area, and her demeanor, and certain responses; and that's the reason I'm going to challenge. I looked at her demeanor and facial expressions. She was hesitant, and unsure of her responses. She lives near the area. |
|---|---|
| The Court: | Well, you know, Mr. [Prosecutor], this would be your third; so, then you're really going to have to explain any challenges hereafter. Do you understand? |
| [Prosecutor]: | Yes, Your Honor. |
| The Court: | Should you challenge any – |
| [Prosecutor]: | I don't want people living near the area. |
| The Court: | I'll let this one go through. |
| [Defense Counsel]: | I'd like to just put on the record – |
| The Court: | Sure. |
| [Defense Counsel]: | That at least as I looked at the whole panel, I think there were only seven black people in the entire panel. This would be the third out of that seven that [the prosecutor] has challenged. As far as living near the area, it seems to me that there have been a number of other jurors who |

|                    |                                                                                                                                                                                                                                                                                                                                                                                 |
|--------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                    | lived in that same area. There was one on Huntington Avenue, and others that lived in the South End that weren't challenged by Mr. [Prosecutor].                                                                                                                                                                                                                                  |
| The Court:         | I haven't looked at the questionnaires. How many other blacks do we have to come up?                                                                                                                                                                                                                                                                                             |
| [Defense Counsel]: | You've excused one, Your Honor, and then the three that were challenged, and there's two on the panel, on the jury.                                                                                                                                                                                                                                                              |
| The Court:         | Are there any more coming up? That's what I'm asking.                                                                                                                                                                                                                                                                                                                            |
| [Defense Counsel]: | There should only be one more, I believe.                                                                                                                                                                                                                                                                                                                                       |
| The Court:         | Well, it seems to me that we're probably not going to get the jury, based upon the questionnaires we've had, and the jurors we have waiting upstairs. There shortly will be more jurors. But this would be the third challenge. I'll let it go through. He's expressed a reason that she is a young woman, she was hesitant in answering the questions. I'll let this go through, but you're going to have a real problem with the next one, Mr. [Prosecutor]. |

Id. at 180:1-182:6.

With respect to "living in the area," defense counsel did not adequately flesh out this issue to the trial judge. He made a general statement that "there have been a number of other jurors who lived in that same area. There was one on Huntington Avenue, and others that lived

-12-

in the South End that weren't challenged." Trial Tr. vol. 1, 181:4-8. The record does not reflect any more specifics

Upon appeal, Herbert indicated that the prosecutor did not challenge a white juror who went to school in the area, or a white juror who worked in the area..[5] See Appellant's Br., Appeal from J. of Suffolk Superior Ct., July, 12, 1994, ("Appellant's Br.") at 45 (citing Trial Tr. vol. 1, 87:1-3, 91:12-13). He also generally referred to the "living in the area" argument, but the citation was only to his general statement at trial, and not to specific jurors' answers. Id.

With respect to other white jurors who expressed hesitation about their ability to be fair and impartial, the defendant noted that there were many, many other white jurors in this category. Id. (citing Trial Tr. vol. 1, 76:10-19, 93:1-9, 112:1-12, 167:11-17, 196:9-198:5, 215:12-15). For example, one white juror, Ms. Osman, had the following exchange with the judge:

> Juror Osman: I think that everyone has – because societal messages are so pervasive, I think everyone has images that are based on race that we work very hard to suppress; so I don't feel like I can honestly say I have no, you know, prejudices at all, but I work very hard to try to not let those interfere in my relationships with people.

> The Court: Well, would you be able to suppress any images you may have and decide this case based exclusively on the evidence, unaffected by any racial difference between the defendant and the alleged victim?

---

[5] To be sure, arguing that the prosecutor did not challenge a white juror who went to *school* in the area, or a white juror who *worked* in the area is not necessarily synonymous with arguing that the prosecutor did not challenge white jurors who *lived* in the area. Nevertheless, the record reflects one white juror who went to school in the area, Juror Lema (he went to Northeastern). Trial Tr. vol. 1, 85:20-90:17. Juror Lema's brother was a Boston Police Officer and the defense challenged him. Id. The juror who worked in the area was Juror Osman (worked at Boston City Hospital). Id. at 90:21-94:9.

Juror Osman:  I think I could do that, yes.

Trial Tr. vol. 1, 93:1-17.

Likewise, other white jurors who were *not* challenged by the prosecutor also expressed hesitation.  When asked if he could be a fair and impartial juror and decide the case solely on the evidence in court, Juror Horan answered, "I believe so. Yes." Id. at 76:10-16.  The court followed up, asking, "any doubt about that in your mind?  Juror Horan: "No; not really." Id. at 76:17-19.  Similarly, Juror Mirabella answered the same question with, "I would try." Id. at 167:17.  Then when asked if there was "any reason at all why" she could not be fair and impartial, Juror Mirabella answered, "I don't think so." Id. at 168:7.  When asked if he could be fair and impartial, Juror Driscoll said, "I think so." Id. at 196:15.[6]

The trial judge designated Juror Osman as the foreperson and had her switch places with a black juror who was in the seat traditionally occupied by the foreperson.  Appellant's Br., at 39 (citing Trial Tr. vol. 1, 259:7-13, 273:5-8).  The black juror who had been taken out of the foreperson's chair and another black juror, as well as two white jurors, were ultimately selected as alternates. Trial Tr. vol. 8, 7:23-8:4.  Indeed, by selecting Juror Osman as foreperson, the judge in effect protected her position as a deliberating juror.  See Trial Tr. vol. 1, 259:7-13, 273:5-8.  See also Trial Tr. vol. 6, 149:2-10.  Alternates were selected randomly from among the seated jurors, except for the foreperson.  See Trial Tr. vol. 6, 149:2-10.  The judge could have done the same for the black juror who sat in that seat.  As a result of these selection procedures, only one black juror deliberated.

_____

[6] It also appears that the black juror, Juror Bobb, was questioned more than the white jurors who expressed hesitancy.

In fact, after the guilty verdict, the judge made an extraordinary comment: "[T]here was a certain element of racism in this case" but he wanted to clarify that "nothing [was] underhanded." Id. at 7:20-21, 8:13. The judge indicated that what sparked his comment was an article quoting "[a]n observer at the trial" thought it "was fixed" that two of three black jurors were selected as alternates. Id. at 7:20-8:6.

## II.    LEGAL FRAMEWORK

Under AEDPA, a federal habeas court must give extraordinary deference to state courts' decisions, and particularly to its findings of fact. 28 U.S.C. § 2254(d). Section 2254(d) allows federal habeas relief only where the state courts' decision was I) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or ii) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). The federal court is to presume that the state courts' factual findings are correct, unless the petitioner produces "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1). Simply put, I have limited authority to overturn a state court's fact-finding.

### A.    <u>Batson</u>

#### 1.    SJC Review

Herbert claims that the trial court erred when it determined that the prosecutor had struck Juror Bobb, a black woman, from the jury pool on race-neutral grounds. <u>Batson</u> established a three-part framework for challenging a peremptory strike on discrimination grounds. <u>Aspen v. Bissonnette</u>, 480 F.3d 571, 574 (1st Cir. 2007). First, the moving party must make a prima facie showing of discrimination in the non-moving party's use of its peremptory challenge. <u>See</u>

Batson, 476 U.S. at 96-97 (1986). Then, the court will ask the non-moving party to offer a non-discriminatory explanation for the challenge at issue. Bissonnette, 480 F.3d at 574; see also United States v. Bergodere, 40 F.3d 512, 515 (1st Cir. 1994). The court will then decide whether to accept the non-discriminatory explanation and allow the challenged juror to be struck. See Batson, 476 U.S. at 98. Moreover, the Court reviews preserved Batson claims for clear error. United States v. Girouard, 521 F.3d 110, 115 (1st Cir. 2008).

The problem for Herbert's claims is threefold and well nigh insurmountable: a) the limited AEDPA review, in which state fact-findings are given deference; b) Batson claims based on trial judge fact-findings are particularly difficult to review on habeas; and c) First Circuit law is singularly inhospitable to the defendant's position.

The SJC found that the first prong was satisfied; the trial judge had found a prima facie pattern of exclusion based on race. See Herbert, 421 Mass. at 313. Such a finding was implied by the fact that the prosecutor was asked to and provided an allegedly non-discriminatory justification challenging Juror Bobb during the voir dire.[7] Indeed, the SJC found this to be underscored when the judge allowed the challenge but indicated that the prosecutor would "have

---

[7] Generally, no justification is required for the use of a peremptory challenge; it is only after finding a prima facie pattern of exclusion -- the first prong of a Batson claim -- that a non-discriminatory justification is required. See Batson, 476 U.S. at 89, 97.

a real problem with the next one." Id. at 314.[8]  I will not second guess the finding of a prima

facie case, because the SJC did not.

The SJC agreed with the trial judge that Herbert had not proven purposeful racial

discrimination (step 3 under Batson).  Herbert, 421 Mass. at 315.  The SJC's decision turned on

the juror's demeanor, the "hesitancy" observation, finding that the trial judge was in a better

position to assess the validity of such a challenge than an appeals court.  Id.  The demeanor

findings were characterized as race-neutral.  Id.  The SJC noted that it had examined the

colloquies with the seven other potential jurors whose answers Herbert claimed to be as

equivocal as the challenged juror's, and that "none expressed doubt about [their] ability to be fair,

as did the challenged juror."  Id. at 315 n.5.

Responses that depend upon the juror's demeanor, or the parties' subjective perceptions,

should be the *most suspect* in terms of whether they can justify the strike of a minority jury,

when a prima facie case of discrimination has been found.  As was said in The Law of Juries (2d

ed. 2009):

> One can describe the reasons for challenging jurors along a
> continuum.  On one end, the most rational end, is the burden of
> demonstrating challenges for cause.  In cause challenges, the
> parties are obliged to put forward a good reason, i.e., a legally
> cognizable one, for seeking to exclude a juror.  Plainly, peremptory
> challenges need not meet that standard.  On the other end, at the
> least rational end, are challenges based upon hunches, or feelings

---

[8] Indeed, that finding was buttressed by the trial judge's extraordinary remarks after the verdict, saying "there was a certain element of racism in this case" but he wanted to clarify that "nothing [was] underhanded."  Trial Tr. vol. 8, 7:20-8:13.  (As described above, this was in response to an article quoting "[a]n observer at the trial" who thought it "was fixed" that two of three black jurors were selected as alternates sparked his comments.  Id. at 7:13-8:4.)  The judge's comments suggest that Batson scrutiny should have been even more searching in this case than most.  "[I]n considering a Batson objection, or in reviewing a ruling claimed to be Batson error, all of the circumstances that bear upon the issue of racial animosity must be consulted."  Snyder v. Louisiana, 552 U.S. 472, 478 (2008).

> or subjective perceptions.  Between the most rational and the least
> rational are challenges supported by some "reason," albeit not the
> best reasons (for the best reasons would qualify for cause
> challenges).  In this category are challenges based on the fact that
> the party antagonized the juror during voir dire, or that the party
> believes that the juror was not entirely candid on voir dire.

Gertner & Mizner, The Law of Juries § 4:26, at 150 (2d ed. 2009).

The "where-the-juror-lives" rationale is arguably rational, because it is objective, and more important, can be tested.  The "juror-was-hesitant" rationale is less rational, more subjective and therefore, more vulnerable to bias.  The case law, however, is precisely the opposite.  Deference is granted to a trial judge particularly when the prosecutor claims that his challenge was based on demeanor.  Snyder, 552 U.S. at 477, 479 (explaining that the trial judge is in a better position to evaluate a prosecutor's claim that a juror looked nervous).

To be sure, in Miller-El v. Dretke, 545 U.S. 231 (2005), the Supreme Court did conduct a searching review of a state jury selection in a habeas petition.  The non-discriminatory reason given by the prosecution for striking a black prospective juror was that the juror seemed apprehensive about the death penalty.  Miller-El, 545 U.S. at 244.  While the state trial court accepted this justification, the Supreme Court found that the prosecution completely mischaracterized the stricken juror's testimony.  Id.  Moreover, the court made "side by side comparisons of some black venire panelists who were struck and white panelists allowed to serve."  Id. at 241.  The Court found support for the Batson claim in the fact that some white prospective jurors were much more apprehensive about the death penalty as compared to the stricken black juror, and those white jurors were "accepted with no evident reservations."  Id. at 244.  The Court also found that black jurors were subject to more pointed questioning from the prosecution whereas non-black jurors, whose initial answers were comparable to the black

jurors, received little or no follow-up questions.  Id. at 249.[9]  As such, the Court reversed the conviction.  Id. at 266.  Miller-El's searching approach, however, is the exception, not the rule, particularly in the First Circuit.

In the case at bar, a side-by-side comparison on both fronts -- hesitancy and residence -- could have led to overturning the prosecutor's strike.  The trial court found otherwise, as did the SJC.  Herbert, 421 Mass. at 315.  With respect to the hesitancy argument, the SJC did conduct a side-by-side analysis because Herbert's appellate brief pointed to colloquies with white jurors who were not challenged and who "gave responses as equivocal as those of the challenged juror."  Id. at 315 n.5.  The Court acknowledged that six of these jurors "tended to couch their responses in less than absolute terms," but found that "none expressed doubt about his or her ability to be fair, as did the challenged juror."  Id.

Notably, the SJC did not actually mention any words uttered by the white jurors to whom it compared Juror Bobb, such as Juror Osman.  In fact, Juror Osman expressed her doubts about being a fair juror, saying, "I think everyone has images that are based on race that we work very hard to suppress; so I don't feel like I can honestly say I have no, you know, prejudices at all, but I work very hard to try to not let those interfere in my relationships with people."  Trial Tr. vol. 1, 93:1-9.  Not only was Juror Osman *not challenged*, she became the foreperson.  Id. at 94:4-7, 273:5-8.

However, with respect to the residence issue, the SJC ignored the claim entirely, even though the issue had generally been preserved.  Appellant's Br., at 45.  The problem here is that recent Supreme Court case law suggests that deference is still due to a state court decision even

---

[9] My review of the voir dire in the case at bar suggests the same pattern -- Juror Bobb was questioned more extensively than the white jurors.

under these circumstances.  See Harrington v. Richter, 131 S. Ct. 770 (2011).  Nevertheless, if I were to evaluate the issue as critically as did the Court in Miller-El, the record here is inadequate.  I cannot identify where the jurors who were unchallenged lived (as opposed to worked or went to school).

### 2.        First Circuit Standard

The First Circuit is particularly inhospitable to Batson claims.  It has never affirmed a district court decision granting a writ of habeas corpus based on a Batson claim.  In three decisions, the First Circuit has reversed district court decisions where the district court had found a viable Batson claim.  See Caldwell v. Malony, 159 F.3d 639 (1st Cir. 1998); Brewer v. Marshall, 119 F.3d 993 (1st Cir. 1997); Simpson v. Commonwealth, 795 F.2d 216 (1st Cir. 1986).  In three others, the First Circuit affirmed dismissals by the district court rejecting Batson claims.  See Gray v. Brady, 592 F.3d 296 (1st Cir. 2010); Aspen v. Bissonnette, 480 F.3d 571 (1st Cir. 2007); Chakouian v. Moran, 975 F.2d 931 (1st Cir. 1992).  The facts are different to be sure, but the rationale for the court's rejection of the Batson claim could not have been broader.

In Caldwell, for example, the court compared black and non-black prospective jurors, otherwise similarly-situated, in analyzing whether the non-discriminatory explanation for the peremptory challenge offered by the non-moving party was pretextual.  Caldwell, 159 F.3d at 653 ("Certainly, as a general matter, comparisons between challenged jurors and similarly situated, unchallenged jurors of a different race or gender can be probative of whether a peremptory challenge is racially motivated.").  Defendant objected to four of the "prosecutor's peremptory challenges, asserting that the prosecutor had purposefully struck *all* black jurors on the basis of their race." Caldwell, 159 F.3d at 642 (emphasis added).  The trial court accepted

the prosecutor's race-neutral explanations for striking these four jurors -- again, that they were hesitant in answering a question about police trustworthiness. Caldwell was convicted by a jury with no black members. Id.

On habeas, the district court held that the race-neutral explanations proffered by the prosecution for two of the four peremptory strikes at issue were pretextual and granted the petition. Id. at 648-49. The district court emphasized that the race-neutral explanation for one of challenged black jurors was not used to challenge a non-black juror with the same characteristic. Id. Further, the district court compared the challenged black juror's responses to those of an unchallenged, non-black juror, and found that the non-black juror "displayed uncertainty that was more substantial" than the challenged black juror. Id. at 648-49.

The First Circuit reversed, finding that the two jurors compared by the district court were only "superficially similar"; and noting that while the black juror's uncertainty seemed to indicate the juror might be biased *against* police officers, the uncertainty of the non-black juror indicated that the juror might be biased *in favor* of police officers. Id. at 653. But the pivotal concern was "giving due deference to the view of the judge who observed the [jury selection]." Id. at 656.[10]

---

[10] See also Brewer, 119 F.3d at 1005. In Brewer, the district court granted habeas relief and the circuit court reversed finding that, generally, numbers alone cannot affirm a Batson claim where there is no evidence of judge insensitivity or improper motive of the prosecutor. The standard is extraordinarily high, particularly for the first prong of the Batson analysis. The petit jury that convicted Brewer was all white, although selected from Suffolk County, the most racially diverse county in the state. The venire had seven African Americans. The striking of 66% of the African Americans in the venire did not alone amount to a prima facie case of discrimination under the circumstances, the Court found; additional evidence of discrimination was needed. For counties outside of Suffolk County and for the federal district itself, with a far smaller minority representation, that conclusion substantially dilutes Batson. Nancy Gertner & Deborah Ramirez, Batson v. Kentucky in the First Circuit: The Emperor has No Clothes, 83 Mass. L. Rev. 58 (1998). In Bissonnette, reminiscent of Brewer, the court again stated that it is questionable whether numbers alone are adequate to show a pattern of discrimination. Bissonnette, 480 F.3d at 577 ("[A] party 'who advances a Batson argument ordinarily should come forward with facts, not just numbers alone.") (quoting Bergadere, 40 F.3d at 516).

As noted above, there are three First Circuit cases where the <u>Batson</u> claims were unsuccessful at the district court. <u>See</u> <u>Gray</u>, 592 F.3d 296; <u>Bissonnette</u>, 480 F.3d 571; <u>Chakouian</u>, 975 F.2d 931. In each, the prosecutors were never even asked to provide non-discriminatory justifications for peremptory challenges used during jury selection. <u>Gray</u>, 592 F.3d at 299; <u>Bissonnette</u>, 480 F.3d at 573; <u>Chakouian</u>, 978 F.2d at 932. The trial judge did not find a prima facie showing of discrimination under the first prong of <u>Batson</u>.

In this racially charged case, however, the jury selection should have been more careful. The answers offered by the prosecutor for challenging the third black juror should have been scrutinized more carefully by the trial judge. Nevertheless, "testimony" is too vague a standard, too vulnerable to bias to justify the challenge. It is literally in the eye of the beholder -- and the "beholder" despite his best intentions, may be biased. However, given the standards I am obliged to apply, I cannot say this is error sufficient to grant this habeas petition.

## III.    INTERROGATION

Herbert claims that his confession was involuntary both because after he had invoked his <u>Miranda</u> right to counsel, the questioning did not end, and because of his young age, low IQ and limited education. As with the <u>Batson</u> challenge, Herbert has to deal with fact-findings made the trial judge, and ratified by the SJC. Whatever the deficiencies in the record, it is simply not sufficient to justify habeas relief.

There is no question that once a defendant requests an attorney, all custodial interrogation must end. <u>Miranda v. Arizona</u>, 384 U.S. 436, 473-74 (1966); <u>Edwards v. Arizona</u>, 451 U.S. 477, 484 (1981). As long as it is reasonably apparent that the defendant wants a lawyer, the police must stop all attempts to question the defendant. <u>Davis v. United States</u>, 512

U.S. 452, 460 (1994). When a defendant asserts that the government obtained a statement in violation of <u>Miranda</u>, the government bears the burden of proving that the defendant made a knowing, voluntary and intelligent waiver. <u>Miranda</u>, 384 U.S. at 475. In assessing whether the defendant has understood and waived his rights, the totality of the "surrounding circumstances" must be considered, including "the characteristics of the accused and the details fo the interrogation." <u>Schneckloth v. Bustamante</u>, 412 U.S. 218, 226 (1973). These characteristics include youth, lack of education and low intelligence.

During the first day of the evidentiary hearing on Herbert's motion to suppress his taped post-arrest confession, four people testified: 1) Detective Bruce Holloway (present during Herbert's arrest and confession); 2) Detective Carl Washington (present during Herbert's arrest and confession); 3) Herbert; and 4) Lieutenant Brendan Bradley ("Bradley") (a detective present during Herbert's arrest). <u>See</u> Evidentiary Hr'g Tr. vol. 1. During the second day of the hearing, a recording of Herbert's confession was played for the court. <u>See</u> Evidentiary Hr'g Tr. vol. 2, 5:11.

Herbert was nineteen at the time of the interrogation. He had been diagnosed as having learning disabilities, had an IQ tested at 76 and 80, functioned five years below his grade expectancy, and had attention deficit disorder. Appellant's Br. app. at 70a. At the evidentiary hearing, Herbert testified that one of the officers then began to question him and told him that he should tell the truth, should not go down alone, and that his mother was pretty upset. Evidentiary Hr'g Tr. vol. 1, 172:1-14. At this point, according to Herbert, he asked the officer if he could see his lawyer; he had an open case for which he had counsel. <u>Id.</u> at 172:15-173:12. The officer responded that there was no lawyer available. <u>Id.</u> at 174:18-175:3.

It was undisputed that Herbert was alone with two uniformed officers.  <u>Id.</u> at 41:4-18, 158:17-24.  The prosecutor did not challenge Herbert about what happened in the room with the uniformed officers, nor did he call them to refute Herbert's statements.  In addition, Herbert claimed that, soon after Detective Holloway came into the room, he asked for a lawyer again.  <u>Id.</u> at 176:20-178:4.  Holloway told him that he would get one in court the following day.  <u>Id.</u> Holloway, however, expressly contradicted Herbert, <u>id.</u> at 75:5-15.  Lieutenant Bradley suggested that he gave Herbert his <u>Miranda</u> warnings even earlier, at Herbert's home, reading from his "card."  <u>Id.</u> at 230:7-15.  No document supported that claim.

During the second day of the evidentiary hearing, the recording of Herbert's confession was played for the trial court.  <u>See</u> Evidentiary Hr'g Tr. vol. 2, 5:11.  The tape opened with Detective Holloway asking Herbert to confirm that he had been advised of his <u>Miranda</u> rights prior to the taping.  Appellant's Br. app. at 19a.  Herbert responded that he had understood those rights.  <u>Id.</u>  Detective Holloway then advised Herbert of his <u>Miranda</u> rights again, this time on tape.  <u>Id.</u> at 19a-20a.  Herbert gave his account of what happened on the night of January 14, 1990.  <u>Id.</u> at 21a-60a.

On February 21, 1991, the trial judge denied Herbert's motion, holding that the Commonwealth had proven beyond a reasonable doubt that Herbert received and understood his <u>Miranda</u> rights, and voluntarily made his post-arrest statements.  <u>Id.</u> at 62a-64a.  He made specific findings of fact, which the SJC restated in its opinion affirming Herbert's conviction.  <u>See</u> <u>id.</u>; <u>Herbert</u>, 421 Mass. at 309-11.  The SJC expressly rejected Herbert's argument that in light of "his uncontroverted testimony" that he asked the uniformed police officers if he could have a lawyer, it was wrong for the trial judge to find that "'[n]o police officer told the defendant

that he should tell the truth and the defendant never requested an attorney, and he was never told that an attorney was not available.'" Herbert, 421 Mass. at 311. The SJC found that "[t]he experienced trial judge undoubtedly was aware that the prosecutor's failure to call either of the uniformed officers could support an inference that their testimony would have been unfavorable to the Commonwealth, but the judge certainly was not required to draw that inference." Id. at 313. The SJC also did not consider Herbert's age, education level, or low intelligence, all factors raised by Herbert in his motion and on appeal.

The SJC has since found that when confessions are not recorded, the jury must be instructed to weigh the evidence of statements with caution. See, e.g., Commonwealth v. Barbosa, 457 Mass. 773, 800 (2010). Here, at least two prior interrogations -- with the uniformed officers, Holloway and Washington -- were not recorded. Nevertheless, the SJC rule is prospective; there is no error. And the trial judge's and the SJC's failure to specifically account for Herbert's age, education level or low intelligence, while troubling, is not sufficient to undermine its opinion.

As with the jury selection, in the face of specific fact-findings by the trial court, affirmed by the SJC, fact-findings which I am obliged to review for clear error, this petition must fail.

## IV.   WAIVER

While Herbert raises a number of issues in his petition for a writ of habeas corpus, the jury selection claim and the admissibility of his confession claim are the only two that have been preserved. Because Herbert did not develop his other claims in his memorandum of law in support of his petition, those claims are waived. The First Circuit has stated that:

> [T]he settled appellate rule [is] that issues adverted to in a
> perfunctory manner, unaccompanied by some effort at developed

> argumentation, are deemed waived.  It is not enough merely to
> mention a possible argument in the most skeletal way, leaving the
> court to do counsel's work, create the ossature for the argument,
> and put flesh on its bones.

United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (citing Brown v. Trustees of Boston

Univ., 891 F.2d 337, 352 (1st Cir.1989); Leer v. Murphy, 844 F.2d 628, 634 (9th Cir.1988)

("Issues raised in a brief which are not supported by argument are deemed abandoned.")).  See

also Smiley v. Maloney, No. 01-11648, 2003 WL 23327540, at *15 (D. Mass. Oct. 31, 2003)

(finding that habeas petitioner's claim was waived because he had not advanced any argument in

his memorandum of law in support of his petition on that point, but disposing of the claim on

two additional grounds).

## V.       CONSTITUTIONALITY OF AEDPA

Although Herbert contends that he has established his entitlement to habeas corpus relief

under §2254(d)(1) and (d)(2), as amended by AEDPA, he also argues that AEDPA's

unreasonable application standard violates the Constitution he is therefore entitled to have his

claim reviewed under the more lenient pre-AEDPA de novo standard.  The First Circuit has

rejected all of Herbert's challenges to the constitutionality of AEDPA.  Although many of the

cases that have rejected constitutional challenges to AEDPA have had "spirited dissents", see,

e.g., Evans v. Thompson, 518 F.3d 1, 3 (1st Cir. 2008), with which this Court has considerable

sympathy, I am bound by majority opinions.

## VI.      CONCLUSION

For the reasons set forth above, the petition is denied and this case is **DISMISSED.**

**SO ORDERED.**

Date:  July 21, 2011        _/s/ Nancy Gertner_

            **NANCY GERTNER, U.S.D.J.**